DECISION AND JUDGMENT ENTRY
This appeal comes to us from a judgment of conviction and imposition of sentence issued by the Lucas County Court of Common Pleas. After the return of a jury verdict, appellant was found guilty of crimes involving the use of a stolen credit card. Because our review fails to disclose that the trial court committed plain error, we affirm.
On June 1, 1999, appellant, Ronald Tyra, was found guilty of two counts of receiving stolen property, in violation of R.C. 2913.51 and 2913.71(A), and two counts of forgery, in violation of R.C. 2913.31(A)(1). The convictions stemmed from appellant's alleged possession of and unauthorized use in March 1998 of a credit card issued to Hetzel Dickens — an ill, elderly man who died in May 1998. The following evidence and testimony was presented at trial.
Carol Dopfer, Hetzel Dickens' daughter, testified that her seventy-six year-old father lived with her and her family during the sixth months prior to his death in May 1998. She stated that her father kept his credit cards in his wallet which he would usually leave laying out in his bedroom. She testified that Dickens himself had not used his credit cards in the few months before his death, since he had been ill and did not leave the house.
Dopfer testified that on March 1, 1998, Dickens told her that his credit cards were missing. She stated that her father then notified several of the credit card companies (including Household Finance, Sears, and Andersons) of the theft and talked to a Detective Brannon from the Toledo Police Department about the missing cards. Dopfer further testified that appellant, who lived down the street, visited with her father "out front" on a few occasions, but that appellant and her father were not friends. To Dopfer's knowledge, her father never asked appellant to run errands for him or gave him permission to use his credit card.
The next witness, John Kaczynski, was the general manager of "Parts America," an auto parts store formerly known as "Western Auto".[1] He testified that on March 1 and 2, 1998, a man who looked like appellant had purchased large amounts of car stereo equipment using Hetzel Dickens' credit card. Kaczynski remembered the specific incident because he noticed the equipment on the counter on the second day was virtually the same as the first purchase, and thought the man was returning the items he had purchased the day before. Kaczynski identified two credit card statements for $265.55 and $212.47 as purchases made at his store on March 1 and 2, 1998, respectively. He agreed that the signatures were illegible, but noted that store policy does not require the routine comparing of signatures against the credit card signatures.
Kaczynski further testified that on June 30, 1998, he had spoken with Detective Brannon about Dickens' stolen credit cards. Kaczynski chose appellant's picture from a photo array presented by Detective Brannon; however, Kaczynski wrote "50 per cent sure" on the photo at the time of this identification. Although still stating that appellant looked like the man who purchased the stereo equipment, the manager acknowledged at trial that he was not "one hundred per cent" sure.
Another witness, Ashley Paszczykowski, a ninth grade high school student who had dated appellant's son, Charles, testified that on March 1, 1998, she accompanied appellant and Charles to the Toledo Parts America store. She recalled that on the way to the store, appellant told her and his son not to use his real name. She saw appellant give the clerk a credit card and heard appellant give a fake phone number and a "weird name." At trial, she did not recall the specific name, but remembered that it was uncommon. Paszczykowski said that appellant then signed the credit card slip and the three left the store. Outside, appellant and his son were laughing; when she asked why, they said, "I can't believe we got away with that."
Paszczykowski also spoke about a conversation she had with Detective Brannon in May 1998. On cross-examination, she acknowledged that she may have given additional information to Detective Brannon at that time, including that appellant had stated the name "Hetzel Dickens" and his address when he presented the card to the clerk.
The next witness, John Arnold, testified that he had lived down the street from and was friends with appellant and his son. Arnold remembered speaking with Detective Brannon in the past year, but could not pinpoint the exact month. Arnold testified that appellant had added speakers and an amplifier (whose logos had been covered with spray-paint) to his car some time during the prior year. He could not recall exactly when these items were installed or any other details regarding the source of the equipment. He also could not recall whether or not appellant was employed in February and March 1998, but acknowledged that appellant was usually "around" anytime, day or night.
Bonnie Tyra, appellant's wife, then testified. She stated that in March 1998, she, her husband, and her son Charles lived down the street from the victim. Mrs. Tyra stated that at that time an older son sometimes came to stay with them on weekends. She also noted that other people came to her home and occasionally used the telephone. She remembered speaking with Detective Brannon a year earlier. Brannon had taken information from her, including her address, phone number and social security number during his 1998 investigation. However, at trial, when asked if her phone number at the time of the incidents was "381-3205," Mrs. Tyra stated, "It might have been. I don't remember."
Mrs. Tyra then testified that she recalled accompanying appellant, their son, and Ashley to the Parts America store on March 1, 1998. She could not recall what time of day it was. She stated that she and Ashley paired off and wandered through the store while appellant and Charles sought to buy a belt for their car. According to Mrs. Tyra, she and Ashley were looking at air fresheners about ten feet from appellant when he was at the counter purchasing the part. She did not see how he paid for the purchase. Mrs. Tyra did not remember appellant and her son talking about anything as they left the store. She insisted that Ashley had never ridden alone in the car with appellant and Charles, because appellant would never pick up Ashley without her. However, she later acknowledged the possibility that appellant could have taken just Ashley and Charles in the car, without her being present.
Robert E. Keating, a manager at Household Finance Corporation ("HFC"), testified that Dickens' credit card which was used to make the purchases at the auto parts store was issued through one of HFC's subsidiaries. Keating testified that the documents he presented were regular business records which showed various account activities, including inquiries or communications made by Dickens, the account holder. The records established that on March 1, 1998, a purchase for $190.70 was made at the "Western Auto" store in Northwood, Ohio, and another purchase for $265.57 was made at a "Western Auto" in Toledo, Ohio. Records for March 2, 1998 show purchases at the same Toledo "Western Auto" store for $143.35 and $212.47.[2]
The records also showed telephone charges made to Dickens' credit card from phone number "381-3205" totaling more than $280. Records of other communications from stores regarding the use of the credit card were also included in the documents presented. In a memo dated March 3, 1998, it is noted that a white male, approximate age thirty, named "John" had stated he was the account holder's son. John had tried to get authorization to use the card to buy a computer, but had no identification and was prevented by a block on the account. A subsequent entry on that same date, states that the card holder allegedly called in to verify that "John" was his son and had his permission to use the card. The records then show that the card was reported "lost," also on March 3, 1998, by the card holder who was "very hard of hearing". The account was closed on March 4, 1998.
The state then rested. Appellant moved for acquittal pursuant to Crim.R. 29, but the motion was denied by the trial court.
In defense, appellant called Detective Brannon who testified regarding the information gathered during his investigation. He stated that appellant had cooperated fully and provided samples of his handwriting for testing purposes. However, the analysis could not be performed because the Bureau of Criminal Investigation would not accept copies of the forged credit slips and the originals could not be produced.
The jury ultimately returned guilty verdicts and appellant now appeals those convictions, setting forth the following sole assignment of error:
 "APPELLANT WAS DENIED HIS SUBSTANTIAL RIGHT TO WITNESS CONFRONTATION WHEN [SIC] DECEASED VICTIM'S DAUGHTER TESTIFIED WITHOUT PERSONAL KNOWLEDGE ABOUT THEFT OF HER FATHER'S CREDIT CARD."
Appellant argues that the admission of the victim's daughter's testimony was plain error and trial counsel's failure to object constituted ineffective assistance of counsel. Failure to object to an error in the trial court in a criminal proceeding precludes the issue from being raised on appeal, unless the issue rises to the level of plain error. See State v. Underwood (1983),3 Ohio St.3d 12, 13; State v. Long (1978), 53 Ohio St.2d 91. Plain error is an obvious error or defect in the trial court proceedings, affecting substantial rights, which, "but for the error, the outcome of the trial court clearly would have been otherwise." See Crim.R. 52(B); State v. Underwood, supra; Statev. Long, supra. It is well established that notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long, supra, at 95.
The admission or exclusion of evidence is left to the sound discretion of the trial court. State v. Morales (1987),32 Ohio St.3d 252, 257. A person may testify as to those matters which are within his or her personal knowledge. See Evid.R. 601 and 602. Generally, an out-of-court statement other than one made by the witness while testifying at trial, which is offered to prove the truth of the matter asserted, is inadmissible hearsay. See Evid.R. 801 and 802. However, an exception to the hearsay rule exists if an out-of-court statement is offered to show the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, [or] mental feeling * * *." See Evid.R. 803(3).
In this case, Carol Dopfer testified that her father had reported to her that his credit cards were missing and that he intended to inform the issuers. Dopfer was present when Detective Brannon came to the house. No testimony was elicited as to the details of the conversations; but only as to Dickens' actions regarding the missing credit cards. In our view, the daughter's testimony was a factual description of what she observed regarding her father's state of mind, intent, and habit of use regarding the allegedly stolen cards.
However, even assuming arguendo that the testimony was erroneously admitted, the record contains other admissible evidence from which the jury could have found that Dickens' cards were stolen, i.e., Ashley's testimony as to appellant's alleged fraudulent use of Dickens' card; the records from the credit card company; the cancellation of the account; and the report and subsequent police investigation. Thus, we cannot say that, but for the daughter's testimony, the outcome of the trial would have been otherwise. Therefore, the error, if any, does not rise to the level of plain error. Consequently, appellant's argument as to ineffective assistance of counsel for failure to object to the testimony must also fail. See State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus and Strickland v. Washington (1984),466 U.S. 668, 694.
Accordingly, appellant's sole assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
James R. Sherck, J., Richard W. Knepper, P.J.,Mark L. Pietrykowski, J., CONCUR.
[1] "Western Auto" and "Parts America" are interchangeable for the purpose of identifying the store where the credit card charges were made.
[2] The records also show numerous other purchases, including $232.62 at a Murray's Discount Auto store, also in Toledo; small charges at gas stations, and charges of $100 or more at Technet, Inc., Office Depot, and Radio Shack.